## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| BRUCE A. ARBIT and MARK WINTERS, derivatively on behalf of Nominal Defendant, Bovie Medical Corp., <br><br> Plaintiffs, <br><br> -against- <br><br> ANDREW MAKRIDES, J. ROBERT SARON, GEORGE W. KROMER, MICHAEL G. NORMAN, AUGUST LENTRICCHIA, STEVEN MACLAREN, GREGORY ALAN KONESKY, MOSHE CITRONOWICZ, PETER PARDOLL, and LEONARD KEEN, <br><br> Defendants, <br> -and- <br><br> BOVIE MEDICAL CORP., <br><br> Nominal Defendant. | Case No. 8:11-cv-02020-JSM-TBM |

## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAINTIFFS' COUNSEL'S FEE AND EXPENSE AWARD AND AN ENHANCEMENT AWARD TO NAMED PLAINTIFFS

<u>Preliminary Statement</u>

Plaintiffs, Bruce A. Arbit ("Arbit") and Mark Winters ("Winters," collectively, "Plaintiffs"), on behalf of themselves and Nominal Defendant Bovie Medical Corp. ("Bovie" or "Company") submit this memorandum of law in support of their motion requesting an order: (1) finding that the proposed settlement ("Settlement") of this shareholders' derivative action on the terms provided in the Stipulation and Agreement of Settlement ( "Stipulation") filed with the Court on June 26, 2014 (Dkt. 99) is fair, reasonable, and adequate to Bovie and its shareholders, and granting final approval of the Proposed Settlement; (2) entering Final Judgment in the form attached as Exhibit E to the Stipulation and as Exhibit A hereto; (3)  granting Plaintiffs' Counsel's  request for attorney's fees and the reimbursement of their out of pocket expenses in the agreed upon amount of $850,000.00 ("Fee and Expense Award"); and (5) granting Plaintiffs' application for an Enhancement Award in the amount of $2,500.00 to each named Plaintiff ("Enhancement Award")[1].

The Proposed Settlement presented here, which the Court preliminarily approved on July 2, 2014 (Dkt. 105), constitutes an excellent result for the Company.  It first recognizes that during the course of the litigation, and as a consequence of the litigation, Bovie instituted a number of major managerial and other changes which the Plaintiffs sought to impose upon the Company by way of the Action, and which were materially induced by the prosecution of the Action, including a $7,000,000 equity infusion and the settlement of related litigation which would have cost the Company hundreds of thousands of dollars.  It further requires the Company to adopt significant corporate governance changes.  *See* Terms of Proposed Settlement, *infra*.

---

[1] Simultaneously with the filing of this memorandum, Plaintiffs are filing the Declaration of Lynda J. Grant dated September 15, 2014 ("Grant Aff." or "Grant Aff., Ex.__", the exhibits thereto and the Declaration of Jed D. Melnick, Esq. ("Melnick Declaration", "Melnick Dec." or the "Melnic Dec. at ¶__").  The Enhancement Award is to be paid from the fees awarded to Plaintiffs' counsel. Stipulation at § 5.3, 5.4.  Significantly, the Fee and Expense Award is less than half of Plaintiffs' Counsel's lodestar.  *See* Grant Aff., at ¶11.

The Proposed Settlement, was the product of three years of vigorous litigation, which included significant briefing and the Plaintiffs' success on a motion to dismiss, significant formal and informal discovery, including the review and analysis of over 45,000 pages of documents, and the interviewing of witnesses in both New York and Detroit, and three full days of mediation over the course of several months before Jed D. Melnik, Esq., a respected mediator for JAMS, Inc.   As the Melnik Declaration confirms, the terms of the Proposed Settlement and the subsequent negotiation of Plaintiffs' Counsel's Fee and Expense Award, were only obtained after significant and rigorous negotiations not just with Defendants and their counsel, but with a complex groups of insurance carriers, that involved complicated issues of insurance coverage in both this Action and in related actions.

The Proposed Settlement is a particularly good result as there were substantial questions concerning Defendants' ability to satisfy a large money judgment, had one been rendered in this case.   Certain of the insurance carriers had significant questions concerning the Individual Defendants' coverage.   Thus, had the parties ("Parties") continued the litigation to trial and judgment, it is unlikely that Plaintiffs and the Company would have obtained a better result that that provided by the Proposed Settlement.   Moreover, the terms of the Proposed Settlement positions the Company to be more successful in the future - a benefit both to the Company and its shareholders.   In fact, the Company's shares are trading from a low of under $3.00 per share to over $4.00 per share as of this writing.   Grant Aff., Ex. E.[2]

Plaintiffs further request an order awarding them the agreed upon $850,000 Fee and Expense Award, which was negotiated after the terms of the Proposed Settlement were fully negotiated. Melnik Dec. at ¶13.   These fees, which are substantially below Plaintiffs' Counsel's

---

[2] The Court may take judicial notice of stock prices. *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004)

cumulative lodestar, are more than fair and reasonable given the amount of litigation in which the Parties engaged, and the value of the Proposed Settlement obtained.  Moreover, the Fee and Expense Award will be paid by certain of the various insurance carriers, and thus will not impact the Company.

Finally, Plaintiffs' seek a modest Enhancement Award of $2,500 to be paid to each named Plaintiff, to be paid from Plaintiffs' Counsel's fees, for the time and effort they expended in litigation this Action. (Dkt. 99 at § 5.3).[3]

In short, the Proposed Settlement, the Fee and Expenses Award and the Enhancement Award are fair, reasonable and adequate.  The Parties implemented a comprehensive notice program. To date, Plaintiffs' Counsel has not received any objections to the fairness, adequacy, or reasonableness of the Proposed Settlement, the Fee and Expense Award or the Enhancement Award.

As such, Plaintiffs' respectfully request that the Court enter the Order and Final Judgment.

## Background to the Proposed Settlement

This Action arose from the alleged mismanagement of Bovie by its directors and officers ("Individual Defendants"),[4] during the period commencing 2008 through at least 2012.  During that time period, Plaintiffs allege that the Defendant Directors ran Bovie, a small, medical device company, like their own personal fiefdom—installing relatives as executives, failing to take steps

---

[3] The parties acknowledged and agreed that the fact that Plaintiffs Arbit and Winters are seeking an Enhancement Award shall not be considered in the determination of the amount of the fee and expense award.  (Dkt. 99 at § 5.3).

[4] Andrew Makrides ("Makrides"), J. Robert Saron ("Saron"), George S. Kromer ("Kromer"), Michael G. Norman ("Norman"), August Lentricchia ("Lentricchia"), Steven Maclaren ("Maclaren"), Gregory Alan Konesky ("Konesky"), Moshe Citronowicz ("Citronowicz"), Peter Pardoll ("Pardoll"), and Leonard Keen ("Keen").

necessary to ensure that the Company properly exploited its products, and violating the law such that the Company was subject to repeated lawsuits, which it either settled or lost.

The procedural history of the Action and Proposed Settlement are described in the Stipulation (Dkt. 99 at 2-5).

## Terms of the Proposed Settlement

There is little question that the filing of the Complaint and the Amended Complaint induced the Company to take significant action during the pendency of the Action. Consequently, as part of the Proposed Settlement, the Defendants have agreed that the prosecution of the Action was a material factor in:

(1)     The Company's decision in March 2012, to reduce the size of its Board from nine to seven, thereby increasing the influence of its independent directors;

(2)     The Company's decision in 2013 to seek and obtain a $7 million capital infusion in order to commercialize its J-Plasma product;

(3)     The Company's decision in November 2013, to settle related litigation styled *Livneh, et al. v. Bovie Medical Corp., et al.*, Case No. 8:12-1492-VAC-TBM ( "Livneh Litigation"), filed in the United States District Court for the Middle District of Florida, which if unresolved, would have exposed the Company to significant litigation costs and to a potentially significant judgment;[5] and

(4)     The Company's decision, through the mediation and settlement of the Action to settle various related disputes between it and Illinois National Insurance Company and National Union Fire Insurance Company of Pittsburgh, P.A. concerning insurance coverage available in this Action and in a separate litigation styled *Keen v. Bovie Medical Corp.*, Case No. 8:12-cv-00305-SCB-EAJ ( "Keen Litigation"), which disputes, if unresolved, would have exposed the Company to significant litigation costs. (*Id.*, Ex. A).

---

[5] The Livneh Settlement resulted in the Company obtaining rights to certain technologies that it had originally lost to Livneh.  If the Company properly exploits this technology, it could provide the Company with several million dollars in revenue. *See, e.g.*, Grant Aff., Ex. F (A. Stephan, *Bovie Medical: Encouraging Management Changes and Resolution of Legal Issues,* noting that if Bovie can produce an upgraded generator for the Seal-n-Cut technology, given the license it has negotiated with Livneh, it could conservatively earn about $2.5 million).  Moreover, the Company regained technology called the MEG and SEER technologies for which it had originally taken a write down of over $700,000, which will now be reversed. *Id*.

The Stipulation further provides that, upon the effectiveness of the Proposed Settlement, that Bovie's Board of Directors will institute and implement, and maintain for four years, certain corporate governance measures described in Exhibit B to the Stipulation (*Id.* at § 2.2). Those benefits include:

  (1) <u>The Creation of Lead Independent Director.</u>  The Board will create a position of Lead Independent Director that will:  (A) coordinate the activities of independent directors, coordinate with the CEO and corporate secretary to set agendas for board meetings, and chair executive sessions of independent directors; and (B) meet with the Compensation Committee to discuss CEO performance.

  (2) <u>The Extension of CEO Evaluation Process.</u>  The Company's Board of Directors will extend the current CEO evaluation process described in the Company's Corporate Governance Guidelines to the Chairman, President COO, or any person performing like functions.

  (3) <u>The Evaluation of the Company's Code of Business Conduct and Ethics.</u>  The Corporate Governance and Nominating Committee will, on an annual basis, consider whether amendments to the Code of Business Conduct and Ethics are required and discuss those changes.

  (4) <u>The Codification of Certain Practices.</u>  The Company will codify (to the extent not already implemented and codified) the following practices in its Corporate Governance Guidelines, Audit Committee Charter, and/or Compensation Committee Charter, as appropriate:

    (a) A provision that there will be no fewer than four regular meetings per year of the Board of Directors with an agenda to be disseminated prior to the meeting and minutes that are kept and circulated at the following Board meeting.

    (b) A prohibition on the hiring of any relative of any member of management, or the retention of any such person, or the renewal of any contract of any such person without formal consideration and approval by the Audit Committee, which consideration shall include whether the terms of such hiring, retention, or renewal is fair and reasonable to the Company.

    (c) A prohibition on the appointment of any relative of any member of management or the Board, or any consultant to the Company, or any person with a material contract or agreement with the Company, to the Board without consideration and formal approval by the Audit Committee, which consideration shall include whether the terms of such hiring, retention, or renewal is fair and reasonable to the Company.

    (d) A provision requiring that the Company annually circulate the Code of Business Conduct and Ethics and the execution of a certification by managers,

officers, and directors indicating that they have read and understood its provisions.

(e)     A provision requiring that the Compensation Committee's advisors be independent of Company and its executive officers and directors.

(f)     A provision requiring that the Audit Committee's minutes be maintained and circulated to the Board of Directors.

(g)     A provision requiring that the Audit Committee maintain oversight of any criminal or regulatory enforcement inquiry, investigation, or proceeding involving the Company, an executive officer, or a director, with such oversight to include consideration of each such matter at each regular meeting of the Audit Committee and the making of recommendations to the Board, after consultation with counsel, if necessary.

(h)     A provision requiring that the Audit Committee maintain oversight of any litigation to which the Company is a plaintiff or defendant, with such oversight to include the consideration of each such matter at a regular meeting of the Audit Committee and the making of recommendations to the Board, after consultation with counsel, if necessary.

(i)     A provision requiring that the Audit Committee maintain oversight over any material litigation to which an executive officer or director of the Company is made a defendant by reason of being an executive officer or director of the Company, with such oversight to include consideration of each such matter at each regular meeting of the Audit Committee, including whether it is appropriate for the Company to provide advancement or indemnification to each such officer or director, and the making of recommendations to the Board, after consultation with counsel.

(j) A provision authorizing that the Audit Committee, with respect to each inquiry, investigation, or litigation matter over which the Audit Committee is required to exercise oversight responsibilities and without further action by the Board, to commence an internal investigation and, in that connection, to employ at the Company's expense such legal and other advisors as the Audit Committee deems appropriate.

(5)     <u>Limitation on Return of Options.</u>   The Company will also not return to Citronowicz (the Company's head engineer), the 75,000 vested and unvested options that were cancelled on or about November 29, 2011.  The Board and Compensation Committee will retain full discretion to compensate Citronowicz for performance or incentive purposes in any manner consistent with their fiduciary duties; provided, however that any additional compensation will

be based on his activities and performance subsequent to the cancellation of those options and will be recorded in the minutes.[6]

### Bovie Shareholders Have Been Provided With Adequate Notice of the Settlement

By order entered on July 2, 2014, the Court preliminary approved the Settlement (Dkt. 104), and entered an order providing for notice ("Notice"). (Dkt. 105). Shortly thereafter, the Parties filed a joint motion for entry of an amended preliminary approval order (Dkt. 107), setting forth an enhanced notice program including the publishing of a summary notice ("Summary Notice") of the Proposed Settlement in the *Investor's Business Daily*, and publication of the Notice on both the Bovie's and Plaintiffs' Counsel's websites, and in a Form 8-K which was filed by Bovie with the United States Securities and Exchange Commission. The Court entered the Amended Preliminary Approval Order on July 7, 2014. (Dkt. 109).

The Notice advised shareholders of the essential terms of the Proposed Settlement and the manner in which they may object to or comment on the Proposed Settlement. It also indicated the date, time, and place set for the Settlement Hearing and sets forth the protocol for Bovie shareholders to comment upon the Proposed Settlement. As such, the form and manner of the Notice constituted the best notice practicable under the circumstances and satisfies Rule 23.1 of the Federal Rules of Civil Procedure and due process. *Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 323 (E.D. Pa. 1993) ("notice by publication may be the principal means for informing [shareholders] of their ... rights") (quoting *Manual Complex Litigation* (Third), supra, § 30.211, at 221); *Stockton v. Globeltel Communications Corp.*, No. 06-60923, (S.D. Fla. Feb. 4, 2008) (finding that due and adequate notice of shareholder derivative settlement was published in accordance with the court's preliminary approval order and satisfied Rule 23.1 and due

---

[6] Citronowicz had 75,000 options exercisable as follows: 25,000 at $3.25 expiring on September 29, 2013; 25,000 at $2.13 expiring on September 23, 2014; and 25,000 at $2.25 expiring on May 5, 2015. Using the stock price as of this writing of $4.26, Citronowicz lost about $300,000 in proceeds as a consequence of the Proposed Settlement. *See* Grant Aff., Ex. G (Citronowicz Form 4 filed 12/2/11).

process).[7]    Furthermore, to date, Plaintiffs' Counsel has not received any objections to the Proposed Settlement, the Fee and Expense Award or the Enhancement Award from any of Bovie's shareholders.[8]

ARGUMENT

POINT I

**THE COURT SHOULD APPROVE THE PROPOSED
SETTLEMENT AS FAIR, REASONABLE AND ADEQUATE**

**A.  The Law Favors Settlements.**

There is a strong policy favoring compromises which resolve litigation. *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1381 (S.D. Fla. 2007).   As the Fifth Circuit stated years ago and is still true today, "[i]n these days of increasing congestion within the Federal court system, settlements contribute greatly to the efficient utilization of our scarce judicial resources." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).  "The factors of 'complexity, expense and duration of the litigation' weigh heavily in favor approving" a representative settlement.   *Woodward v. NOR-AM Chem. Co.*, No. Civ. 94-0780, WL 1063670, at *20 (S.D. Ala. May 23, 1996)(also noting that a complex representative action can occupy a court's docket for years.).

Derivative actions in particular lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome and the typical length of the litigation.  *See Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ("Settlements of derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'").  Settlements of derivative actions are "favored for the reasons that settlements generally are

---

[7] A copy of this order is attached hereto as Exhibit B.

[8] The final day for Bovie shareholders to object to the terms of the Proposed Settlement, the Fee and Expense Award and/or the Enhancement Fee is September 22, 2014.

favored: disputes are resolved; the resources of litigants and courts are saved; and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself." *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986).

**B.    The Proposed Settlement is Fair, Reasonable and Adequate.**

The Court must now determine whether the Proposed Settlement is fair, reasonable and adequate. In analyzing any settlement, the court must take into account "the strong judicial policy favoring settlement as well as the realization that compromise is the essence of settlement." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)("*Bennett*").

In determining whether a shareholder derivative settlement is fair, adequate and reasonable, courts consider the *Brennett* factors, including: (i) the likelihood of success at trial; (2) the range of possible recoveries; (3) the point on or below the range of possible recovery at which a settlement would be deemed fair, adequate and reasonable; (4) the complexity, expense and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Bennett*, 737 F.2d at 986; *accord Sterling v. Stewart*, 158 F.3d 1199, 1203 n.6 (11th Cir. 1998).

These factors need not be applied formalistically. Rather, the fairness of a settlement is left to the sound discretion of the district court and will not be overturned absent a clear showing of abuse of that discretion. *Sterling*, 158 F.3d at 1202; *Bennett*, 737 F.2d at 986. Further, one of the principal factors to consider in this shareholder derivative case is the benefit to Bovie - the real party in interest - as compared to the risks posed by continued litigation. *In re Eclipsys Corp. Derivative Litig.*, (S.D. Fla. Sept. 12, 2008) citing *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978).[9]

**A.    The Likelihood of Success at Trial**

_____

[9] A copy of this order is attached hereto as Exhibit C.

Plaintiffs believe that there was a significant likelihood of success at trial on the issue of liability but that damages would have been difficult to prove.  This Court held that a pre-suit demand upon Bovie's board would have been futile.  *Order on Motion to Dismiss* at 9 (Dkt. 67). Plaintiffs believe that the record they had amassed and would have amassed if the Action continued would have supported the Court's finding that in fact there was liability.  However, in continuing the litigation, Plaintiffs faced three major obstacles:  first, much of the documentation upon which they would have relied in a trial of this Action invoked thorny issues of attorney-client privilege and confidentiality.  Plaintiffs subpoenaed the records in a number of related actions in order to support their claim that the Individual Defendants' mismanagement of the Company repeatedly resulted in its being subject to lawsuits, which the Company either lost or settled and which precluded it from certain medical device markets.  However, many of the documents pertinent to these suits were produced to Bovie pursuant to confidentiality agreements which provided that such documents could only be used with respect to the specific suit, *ie.* the Erbe Litigation, and were marked as confidential by those third parties  Consequently, had Plaintiffs continued to litigate the Action, they would  have been involved in significant satellite litigation over the issue of confidentiality and attorney client privilege, which they may have lost. That would not only have added tremendously to the time and expense of this litigation, but could well have resulted in Plaintiffs being unable to obtain documents critical to their Action.

Second, as set forth above, even had Plaintiffs been successful, there were material questions about their ability to collect a significant judgment.  In fact, several of the insurance carriers were disclaiming coverage on a number of grounds, such that any further prosecution of the Action might well have entailed significant "bad faith" insurance litigation or no recovery.

Further, the limited insurance coverage which they did have was waning. Thus, the longer the Action proceeded, the less money would have been available to satisfy a judgment.

Third, there was a claim that Plaintiffs' damages were speculative and could not be proven. Plaintiffs' primary claim is that due to the Individual Defendants' mismanagement, Bovie was unable to timely exploit the market for certain medical technologies. However, it would have been difficult for Plaintiffs to have obtained an expert who could have opined with any certainty the amount of revenues that Bovie lost as a consequence of this mismanagement, and thus there was a substantial risk that any expert's testimony might have been excluded as speculative. Consequently, Plaintiffs faced a significant risk that if they continued to litigate the Action, even if they proved liability, they would have had difficulty proving damages with the necessary degree of certainty.

Given these obstacles, it was thus questionable whether further litigation would have yielded the Company any better result despite the merits of the claims. Moreover, given the confidentiality issues, there was a significant possibility that Plaintiffs would be unable to obtain documents necessary to prove their claims.

**B.    The Range of Possible Recoveries and the Point at which Recovery Would be Reasonable**

Given that damages were speculative, the range of possible recoveries is also questionable. One aspect of Plaintiffs' damages was its claim that Bovie was shut out of the markets for the argon plasma probe, the SEER/Boss technologies and the Seal-n-Cut and MEG technologies. Although Bovie had stated that each of these markets was worth hundreds of millions of dollars, it was unclear how much of these markets it could capture.

Considering that Bovie's most recent Form 10-K filing for the period ended December 31, 2013 provides that it has not earned revenues for the year of greater than $23,000,000, and

gross profit of about $9,000,000, for all its products, it is unlikely that it damages would be more than a few million dollars, at best.[10]

The speculative nature of these damages, and Bovie's seeming inability, even if it had access to these markets, to be able to exploit them either by itself or with a partner, is significant. A recovery of about $1,000,000 to $3,000,000 for the Company would have been a reasonable recovery under the circumstances.

## C.      The Complexities, Expense, and Duration of the Litigation

As discussed above, this Action involved complex issues regarding privilege, damages, the medical device field, and insurance coverage.   Discovery would have resulted in considerable, lengthy and potentially unsuccessful litigation.   Had the case not resolved, it is likely that it would have continued for several more years, while these difficult issues of confidentiality and privilege were fought, and while insurance coverage was quickly waning.   It was very likely that the Company and the Individual Defendants would have expended their total insurance coverage and would have been unable to pay their counsel, which would have delayed, if not resulted in the complete termination, of the Action.   In short, given the Company's and the Individual Defendants' financial circumstances, and the limited upside potential for recovery, the Proposed Settlement is more than reasonable under the circumstances.

## D.      The Substance and the Amount of Opposition to the Proposed Settlement

As demonstrated above, a comprehensive notice program was implemented to inform Bovie's shareholders of the Proposed Settlement.   To date, despite, Plaintiffs' Counsel has not received a single objection. This fact also further demonstrates that the Proposed Settlement is fair, adequate and reasonable. *Bennett*, 737 F.2d at 987-88; *Kincade v. Gen. Tire & Rubber Co.*,

---

[10] Notably, for 2013, it had an operating loss of over $3,000,000.

635 F.2d 501, 506 n.4 (5th Cir. 1981); *Klein v. Broadhead, et. al.*, 02-20170 (S.D. Fla. Nov. 29, 2004).[11]

E.      **The Stage of the Proceedings at which Settlement Was Achieved**

In determining whether a settlement is fair, courts focus on whether the settlement was reached as a result of good faith bargaining at arm's-length without collusion. *See In re Jiffy Lube Sec. Litig*, 927 F.2d 155, 159 (4th Cir. 1991). As discussed above, the Action was settled in principal after three years of litigation. The Parties then engaged in at least six more months of negotiations over the terms of the Stipulation. Both the litigation and the Proposed Settlement were hard fought. *See* Melnik Declaration.

By the time the parties had engaged in mediation, Plaintiffs' counsel had obtained and reviewed over 45,000 pages of documents, engaged in in-depth interviews of several critical witnesses including former members of Bovie's Board, and reviewed a portion of the records in several of the related litigations. They had also obtained certain additional confidential documents from Keen and his counsel. Plaintiffs' counsel were fully familiar with the strengths and weaknesses of their Action as set forth above. In other words, "the settlement is the result of hard-fought, adversarial, arm's-length negotiation." *See Diaz v. Hillsborough Cnty. Hosp. Auth.*, No. 8:90-CV-120-T-25B, 2000 WL 1682918, at *6 (M.D. Fla. Aug. 7, 2000). As such, the Proposed Settlement enjoys a presumption that it is fair and reasonable, because it is the product of extensive arm's-length negotiations conducted by capable counsel who are well-experienced in class and derivative actions. *In re Eclipsys Corp. Derivative Litig.*, 07-80611, (S.D. Fla. Sept. 12, 2008).

Finally, significant weight should be attributed to the belief of experienced counsel that the Proposed Settlement is in the best interests of those affected by it. *Officers for Justice v. Civ.*

_____

[11] A copy of this order is attached hereto as Exhibit D.

*Serv. Comm'n of City & Cnty. Of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982); *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992), quoting *Cotton*, 559 F.2d at 1330, *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1149 (11th Cir.1983).

Here, counsel on both sides are experienced in corporate and securities litigation and negotiated the Proposed Settlement at arm's length.

F.    **The Proposed Settlement Constitutes an Exceptional Result**

Under the circumstance, the Proposed Settlement is an exceptional result.  It provides the Company with a combination of both financial and corporate therapeutic relief.  In connection with the institution and prosecution of this Action and the Proposed Settlement of the Action, Bovie has resolved related litigation, coverage issues with its insurance carriers, and obtained an equity infusion of $7 million—providing it with financial benefits of over $7 million.  Its settlement in the Livneh Litigation further enabled it to recover the rights to certain technology which it had originally given up to Livneh and can now exploit.  As one commentator noted, if properly dealt with, the Livneh Settlement could provide the Company with income from the exploitation of the Seal-n-Cut device in China of about $2.5 million alone.  Grant Aff., Ex. F. The Company also negotiated back its rights to the MEG technology, which it had originally written off at over $700,000. *Id.*  Consequently, the settlement with Livneh may be worth at least $3 million to the Company.

Moreover, the Company was able to resolve its insurance coverage issues arising from the Keen Litigation.  In the Keen Litigation, the Company was subject to pay Keen's litigation costs (in addition to the $650,000 that it had to pay Keen).  Citronowicz has also given up 75,000 stock options with the potential value of over $300,000.  In short, these actions which were

materially induced by the prosecution of the Action provided the Company with benefits well in excess of $7,000,000.

In addition, the Company will be adopting significant corporate governance measures as described above. Although these do not have specific monetary benefits ascribed to them, since the Proposed Settlement was announced (and the Company obtained a capital infusion), the price of the Company's stock has increased significant (from trading under $3 per share to a closing price of $4.28 per share on September 15, 2014).

Such extensive corporate governance measures alone are sufficient to support a finding that the Proposed Settlement is fair, reasonable and adequate. *See Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (approving derivative settlement mandating structural changes in corporate governance and stating "nonpecuniary benefits to the corporation may support a settlement."); *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d. 1203, 1207 (6th Cir. 1992) (settlement of derivative action approved where defendants agreed to changes in corporate governance); *Zimmerman v. Bell*, 800 F.2d 386, 391 (4th Cir. 1986) (nonmonetary derivative settlement relief adequate when it provided guidelines for 'future management responses to tender offers and takeover bids.'); *Maher*, 714 F.2d at 466 (approving shareholder derivative action consisting only of nonmonetary relief); *U.S. West v. Macallister*, No. 92-B-1254, 1992 WL 427772 (D. Colo.  Dec. 18, 1992) (approving settlement and noting benefit to the corporation and the public from therapeutic portion of settlement through public policy committee); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005) ("Courts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies.").

Further, the Settlement eliminates risks of continued litigation, including the very real risk of no recovery after further lengthy litigation, while providing Bovie and its shareholders substantial benefits. *See Officers for Justice*, 688 F.2d at 625. Indeed, courts have recognized that the "odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).

POINT II

**THE FEE AND EXPENSE AWARD IS FAIR AND
REASONABLE AND SHOULD BE APPROVED**

As discussed above, the Proposed Settlement is an excellent result for Bovie. After the substantive terms of the Proposed Settlement were agreed upon, Bovie, through its insurance carrier, agreed to pay $850,000 to Plaintiffs' Counsel in attorneys' fees, inclusive of expenses of $36,536.48 and a potential Enhancement Award to the named Plaintiffs of $2,500. Melnik Decl. at ¶13. As indicated in the Melnik Declaration, the agreed upon Fee and Expense Award is fair and reasonable and comparable to those awarded in similar cases, and thus should be approved. In fact it is less than half of Plaintiffs' Counsel's lodestar incurred in the prosecution of this Action.

**A.     Plaintiff's Counsel are Entitled to the Fee Award Because the Settlement Confers Substantial Benefits on Bovie and its Shareholders.**

Attorneys who prosecute a shareholder derivative action that confers a "substantial benefit" on the corporation are entitled to an award of attorneys' fees and costs. *See Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970). In *Mills*, the United States Supreme Court stated that "an increasing number of lower courts have acknowledged that a corporation may receive a 'substantial benefit' from a [stockholders' action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature," and that "regardless of the relief granted, private stockholders' actions of this sort

17

'involve corporate therapeutics,' and furnish a benefit to all shareholders . . . ." *Id.* at 395, 396 (citations omitted).

In recognition of the substantial benefits bestowed upon Bovie as a result of Plaintiffs' Counsel's efforts, the Company and the Individual Defendants agree not to oppose or cause any other person to oppose a Fee and Expense Award up to $850,000.  (*See* Stipulation ¶ 5.1). Defendants' insurance carriers shall pay the Fee and Expense Award. (*Id.* at ¶ 5.2.)

The United States Supreme Court has endorsed this type of consensual resolution of attorneys' fees issues in these kinds of cases as the ideal toward which litigants should strive. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee."). Moreover, where there is no evidence of collusion and no detriment to the parties - as is the case here - the court should give "substantial weight to a negotiated fee amount." *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001); *In re Eclipsys Corp. Derivative Litig.*, (S.D. Fla. Sept. 12, 2008) (approving of shareholder derivative settlement and awarding plaintiffs' counsel attorneys' fees in the amount of $2,200,000).  *See* Melnik Dec. at 16.

All counsel were able to consider and utilize as precedent fee decisions from other actions of a similar nature. *Id.*  In such circumstances, the end result of those negotiations, which reflects all parties' experiences as to what is appropriate, is entitled to a great deal of weight in passing on the fee request. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("in cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorneys' fees"). Thus, the Court's role in approving the Fee and Expense Award is very different from a "statutory fee shifting" case, in which the defendant has not agreed to pay Plaintiff's Counsel's

fees and thus reserves the right to challenge every item of work performed that underlies the requested fee.

Here, the Parties, including insurance carriers and the Defendants have agreed with Plaintiffs' Counsel on a fair and reasonable attorneys' fee and expense award after days of mediation, which is less than half of Plaintiffs' Counsel's lodestar, and Bovie's insurance company has agreed to pay that sum. Therefore, the Court need only approve the overall settlement package, including the Fee and Expense Award, as fair, reasonable and adequate. *See, e.g., Officers for Justice*, 688 F.2d at 625; *In re Eclipsys Corp. Derivative Litig.*, (S.D. Fla. Sept. 12, 2008).

**B.    The Requested Fee Award is Supported by an Analysis of the *Johnson* Factors**

"The court may award reasonable expenses for maintaining the [derivative] proceeding, including reasonable attorneys' fees, to a successful plaintiff or to the person commencing the proceeding who receives any relief, whether by judgment, compromise, or settlement . . . ." Fla. Stat. §607.07401(6). *See also Lane v. Head*, 566 So. 2d 508 (Fla. 1990) (awarding plaintiffs' counsel fees and expenses in shareholder derivative litigation). Florida courts have generally adopted the lodestar approach for cross-checking reasonable attorney fees and, in doing so, consider the "Johnson factors" when assessing an award of attorneys' fees.[12] *Rowe*, 472 So. 2d at 1146. The Johnson factors are not rigid and formulaic, but are applied in light of the

---

[12] The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19. The factors included in the Eleventh Circuit's *Johnson* analysis are substantially similar to that employed by Florida state courts. *See Fla. Patient's Compensation Fund v. Rowe*, 472 So. 2d 1145, 1146 (Fla. 1985); *In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 293 (Del. 2002). However, not every factor necessarily needs to be considered. *See In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 502 (N.D. Miss. 1996).

circumstances of a particular case in order to ensure just compensation for counsel. Application of the pertinent factors strongly supports the fairness and reasonableness of the requested Fee and Expense Award.

    1.    <u>Time and Labor Required and the Difficulty of the Questions Involved.</u>

    Shareholder derivative actions are "notoriously difficult and unpredictable." *Maher*, 714 F.2d at 455; *Schimmel v.Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973). Because of the nature of the legal and factual issues involved in the prosecution of this matter, this Action is no different. As indicated by Plaintiffs' Counsel's lodestar, they rendered substantial service in order to obtain the benefits in the Proposed Settlement, despite the fact that there existed a substantial risk that they would not obtain a recovery, especially given the limited insurance coverage here, and the waning nature of the policies. Nonetheless, Plaintiffs' Counsel continued to litigate the Action fully, in order to achieve the best result, aware that their recovery could be limited.

    Further, Plaintiffs' Counsel devoted significant efforts and resources to the pursuit of the substantial benefits ultimately achieved through the Proposed Settlement including, *inter alia*: conducting extensive legal and factual research of the issues involved; obtaining and reviewing tens of thousands of pages of documents, including SEC filings, press releases, news articles, records from related cases, and additional public and non-public publications and documents; researching and drafting a detailed initial and then amended complaint; briefing and winning a motion to dismiss, interviewing witnesses in New York and Detroit, and engaging in extensive negotiations with Defendants and their insurance carries in pursuit of a favorable resolution.

    Although many of Plaintiffs' Counsel's activities took place outside the courtroom, these services were of the highest quality and could only have been rendered by attorneys with significant experience prosecuting shareholder interests. *See* Grant Affidavit, and Exs. C and D.

Further, collectively, Plaintiffs' Counsel's firms have expended 3083.96 professional hours in the prosecution of the Action and the negotiation of the Proposed Settlement of the matter for a total lodestar of $1,814,102.87 and incurred $36,536.48 in unreimbursed litigation expenses. *See* Grant Aff., Exs. A-D. The agreed-upon Fee and Expense Award is less than half the amount of time expended on the prosecution of this Action. In light of the substantial benefit that was conferred upon Bovie and its shareholders, the Fee and Expense Award should be deemed as fair and reasonable. Precedent shows that where Plaintiffs' counsel seeks a fee and expense award substantially below its lodestar, as here, such awards should be approved as reasonable. *See, e.g.*, *Morales v. Consolidated Oil & Gas, Inc.*, 82 CIV. 4871, 1982 WL 1372 at *2 (S.D.N.Y. Dec. 23, 1982)(approving "fees considerably below their [counsel's] lodestar rate."); *Chan v. Diamond*, 03 CIV.8494(WHP), 2005 WL 941477 at *3 (S.D.N.Y. Apr. 25, 2005) ("in view of the fact that the requested fee is significantly less than the lodestar", among other things, the fee was approved); *Brickman v. Tyco Toys, Inc.*, 88 CIV. 3936 (RLC), 1992 WL 111395 at *4 (S.D.N.Y. May 11, 1992) (approving as reasonable a fee request "seeking less than the lodestar figure"); *In re Host Am. Corp. Sec. Litig.*, 305-CV-01250 (VLB), 2008 WL 659579 at *3 (D. Conn. Mar. 7, 2008)(approving fee requesting 88% of lodestar as reasonable because, *inter alia*, "it equals less than the lodestar"); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 991 (D. Minn. 2005)(approving fees in derivative action where "fees requested will provide plaintiff's counsel with less than half of their lodestar").

2.     The Amount Involved and the Results Obtained.

The benefit conferred upon Bovie in the Proposed Settlement is perhaps the most important factor for the Court to consider in its approval of the Fee and Expense Award. *See Hensley*, 461 U.S. at 436 ("most critical factor is the degree of success obtained"). As discussed

above, the benefits provided by the Proposed Settlement are extensive and provide Bovie with benefits worth well over $7,000,000 - a far greater financial benefit than might have been obtained had the Action proceeded to trial.

Thus, the Fee and Expense Award is strongly supported by the terms of the Proposed Settlement. *See, e.g., Mills*, 396 U.S. at 395-97; *Alverson v. Caldwell*, No. 6:08-cv-00045 (M.D. Fla. Apr. 24, 2009) (approving $400,000.00 attorney's fee award for derivative settlement providing corporate governance reforms).[13]

> 3.   The Fee Award is Comparable to Awards and Customary Fees in Similar Litigation.

The Fee and Expense Award being sought is also eminently reasonable when compared to fee and expense awards approved by courts in connection with the settlement of similar litigation.   Indeed, countless shareholder derivative settlements have resulted in the award of greater fee awards than those sought here where corporate governance reforms constituted the settlement consideration. *See, e.g., United Nat'l Ret. Fund v. Watts*, No. Civ. A. 04 CV 3603 2005 WL 2877899, *5 (D.N.J. Oct. 28, 2005) ($9.2 million fee awarded for purely governance reforms).[14]   Cases in Delaware often settle for corporate governance benefits. Consequently, precedent in Delaware is helpful to inform the Court as to what is generally awarded in a derivative action where the company solely receives non-monetary benefits. *See, e.g., In re AXA*

---

[13] A copy of this order is attached hereto as Exhibit E.

[14] *See also In re Jabil Circuit, Inc. Deriv. Litig.*, No. 06-2917-CI-08, Judgment and Final Order Approving Settlement and Dismissing Action (Fla. 6th Cir. Apr. 7, 2008) (awarding fees and expenses of $700,000 in shareholder derivative settlement resulting exclusively in corporate governance reforms); *Deeds v. Barker, et al.*, No. 04-62CI11, Final Judgment and Order (Fla. 6th Cir. Jun. 4, 2007) (awarding fees and expenses of $500,000 in shareholder derivative settlement resulting in corporate governance reforms); *Bristol-Myers Squib Derivative Litig.*, Master File No. 02-CV-8571 (LAP) (S.D.N.Y. July 22, 2005) ($3.5 million awarded for governance changes, with no direct financial benefit to the corporation); *Williamson, et al. v. Bailey, et al.*, Case No. CJ 2002-1144 (Okla. Dist. Oct. 24, 2006) (awarding counsel $1,200,000 for the implementation of therapeutic corporate governance policies and procedures, with no financial benefit to the company); *In re Terayon Commnc'ns Syst., Inc. Derivative. Litig.*, Master File No. CV 807650 (Cal. Super. Ct. Santa Clara Cnty. Sept. 18, 2006) ($950,000 awarded for therapeutic corporate governance changes to the company, with no direct financial benefit).

*Fin., Inc. S'holders Litig., Consol., In re AXA Fin., Inc.,* 18268, 2002 WL 1283674 (Del. Ch. May 22, 2002) (awarding $3,000,000 in fees where plaintiffs partially caused increase in transaction consideration);[15] *Polk v. Good*, 507 A. 2d 531, 538-39 (Del. 1986)(affirming award of $7,000,000 in fees, where benefit consisted of modification of voting provision in stock repurchase agreement). *See also Cohen v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005)(awarding $2.25 million for change in corporate charter, advance payment from insurers to settle class action, and modification of class settlement); *Alverson v. Caldwell*, No. 6:08-cv-00045 (M.D. Fla. April 24, 2009) (approving $400,000 attorney's fee award for derivative settlement providing corporate governance reforms).

      4.    <u>The Skill, Experience, and Reputation of Counsel.</u>

      The experience, reputation, and ability of counsel should be given special heed when considering the fee and expense application. *Officers for Justice*, 688 F.2d at 625. The standing, reputation, and skill of opposing counsel should also be considered in determining the fee because the standing of opposing counsel serves as a barometer of the challenges in litigation. *Schwartz v. TXU Corp.*, 3:02-CV-2243-K, 2005 WL 3148350 at *30 (N.D. Tex. Nov. 8, 2005). Here, the counsel involved have decades of experience in derivative and class action litigation.

      5.    <u>The Contingent Nature of the Fee Award and the Preclusion of Additional Employment.</u>

      Plaintiffs' Counsel undertook this matter on a fully contingent basis. Generally, undertaking the risk of non-payment warrants a larger fee than those cases fixed on a time or contractual basis. *McKittrick v. Gardner*, 378 F.2d 872 (4th Cir. 1967). *See also Lane*, 566 So. 2d at 510. In this instance, Plaintiffs' counsel are seeking a fee which is less than half of what it

---

[15] A copy of this order is attached hereto as Exhibit F.

could have obtained in other matters. Therefore, it would be difficult to argue that the requested fee is not reasonable.

## C.    The Court Should Grant Plaintiffs' Request for an Enhancement Award

Courts routinely approve enhancement (or "incentive") awards to compensate named plaintiffs and class representatives for the services they provided and the risks they incurred in connection with their prosecution of litigation. *Ingram v. Coca-Cola Co.*, 200 F.R.D. at 694 (quoting *In re S. Ohio Corr. Facility*, 175 F.R.D. 270, 272 (S.D. Ohio 1997) (collecting cases)); *see also Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998); *Godshall v. Franklin Mint Co.*, No. 01-CV-6539, 2004 WL 2745890, at *6 (E.D. Pa. Dec. 1, 2004); *In re Linerboard Antitrust Litig.*, (MDL No.1261), Civ. A. No. 98-5055, 2004 WL 1221350, at *18-19 (E.D. Pa. June 2, 2004).  Such award shall be paid to Plaintiffs by Plaintiffs' Counsel out of any fee and expenses awarded by the Court.

## Conclusion

The Proposed Settlement, Plaintiffs' Counsel's Fee and Expense Award, and the Enhancement Award sought by Plaintiffs, should be approved as fair, reasonable, and adequate.

## Certificate Pursuant to Local Rule 3.01(G)

Plaintiffs' Counsel has conferred with opposing counsel and opposing counsel consents to the entry of the final judgment and does not object to the counsel fees and enhancement awards sought by Plaintiffs.

Dated:  September 17, 2014                    Respectfully submitted:


MORGAN & MORGAN, P.A.

By: */s/Christopher S. Polaszek*
Christopher S.  Polaszek
Florida Bar No. 0116866
201 North Franklin Street, 7th Floor
Tampa, FL 33602
Florida Bar No.  0116866
Tel: 888-822-5028
Fax: 813-223-5402
cpolaszek@forthepeople.com

*Local Counsel for Plaintiffs*


Lynda J. Grant
THEGRANTLAWFIRM, PLLC
521 Fifth Avenue, 17th Floor
New York, NY  10175
Telephone:   212.292.4441
Facsimile:     212.292.4442
lgrant@grantfirm.com

*Counsel for Plaintiffs Bruce A. Arbit*


WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

Gregory M. Nespole
Robert Abrams
Patrick Donovan
270 Madison Avenue
New York, NY. 10016
Phone: 212-545-4657
Facsimile: 212-545-4578

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2014, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to

the following parties. In addition, I served the foregoing via Email to the following:

THE GRANTLAWFIRM, PLLC
Lynda J. Grant
521 Fifth Avenue, 17th Floor
New York, NY  10175
Tel:  212-292-4441
Fax:  212-292-4442
lgrant@grantfirm.com

WOLF HALDENSTEIN ADLER
FREEMAN & HERTZ LLP
Robert Abrams
Patrick Donovan
270 Madison Avenue
New York, NY  10016
Tel:  212-545-4657
Fax: 212-545-4578
Abrams@whafh.com
Donovan@whafh.com

CARLTON FIELDS JORDEN BURT
Samuel J. Salario, Jr.
Amanda A. Sansone
Blaise N. Gamba 4221 West Boy Scout
Blvd, Suite 1000
Tampa, FL  336070
Tel:  813-229-4337
Fax:  813-229-4133
ssalario@carltonfields.com
asansone@carltonfields.com
bgamba@carltonfields.com

FISHER, RUSHMER, DICKSON,
WERRENRATH, TALLEY & DUNLAP
P.A.
John E. Fisher
Chris M. Ballentine
20 N. Orange Avenue, Suite 1500
Orlando, FL  32801
Tel: 407-843-2111
Fax: 407-422-1080
jfisher@fisherlawfirm.com
cballentine@fisherlawfirm.com

/s/ Christopher S. Polaszek
Christopher S. Polaszek